## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE VALLEY FINANCIAL GROUP, INC., DELAWARE VALLEY FINANCIAL GROUP, LLC, DVFG ADVISORS, LLC., MICHAEL FEINMAN, HOWARD SOLOWAY, DAVID BLEZNAK, and JOHN DOES 1 through 20 similarly situated | : CIVIL ACTION : : : NO. 08-CV-2590 : : : |
| vs. | : : |
| PRINCIPAL LIFE INSURANCE COMPANY and PRINCOR FINANCIAL SERVICES CORPORATION | : : : |

## DECISION

**JOYNER, J.**                                            **June 1, 2009**

This case has been brought before the Court on Motion of the Plaintiffs for Preliminary Injunction.[1]  Following two full days of hearings in this matter on December 15 and 16, 2008 and numerous submissions by the parties, we find this matter now properly postured for adjudication and we thus make the following:

## FINDINGS OF FACT

1.  Plaintiff Delaware Valley Financial Group, Inc., ("DVFG, Inc.") is a Pennsylvania corporation which was formed in 1978 and

---

[1]  Originally, both Plaintiffs and Defendants sought a temporary restraining order in addition to requesting preliminary injunctive relief. Following a hearing before the undersigned on June 10, 2008, the parties were able to reach an agreement which was ultimately reduced to a Consent Order dated August 18, 2008 and which effectively obviated the defendants' need for a TRO and/or preliminary injunction.  The hearings in December therefore addressed only the plaintiffs' motion and hence this decision shall address the plaintiffs' request for injunctive relief only.

is in the business of acting as an insurance brokerage firm.  As
of September 24, 2008, DVFG had a registered office address at
3200 Horizon Drive, King of Prussia, Pennsylvania, 19406.
(Exhibit P-6; N.T. 12/15/08, 17; Verified Seconded Amended
Complaint and Answer thereto, ¶2).

2.  Plaintiff Delaware Valley Financial Group, LLC ('DVFG,
LLC"), is a Pennsylvania Limited Liability Company formed in 2007
with registered office address as of September 24, 2008 at 3200
Horizon Drive, King of Prussia, Pennsylvania, 19406.  DVFG, LLC
is in the business of marketing and selling property and casualty
insurance. (Exhibit P-7; N.T. 12/15/08, 17, 124; Verified Second
Amended Complaint, ¶3).

3.  Plaintiff DVFG Advisors LLC is a Pennsylvania limited
liability company which is in the business of acting as a
marketing and sales vehicle for use by individual
agents/producers[2] in selling financial services and insurance
products offered by insurers and/or financial service companies.
(Verified Second Amended Complaint and Answer thereto, ¶4).

4.  Plaintiffs Michael Feinman, Howard Soloway and David

_____

[2]  A "producer" is a career insurance/sales agent or broker.  They are
independent contractors who are authorized by a number of insurance and/or
brokerage companies to sell insurance and/or financial products and it is not
uncommon for them to gather together to share office overhead and other
expenses.  (N.T. 12/15/08, 75-76; N.T. 12/16/08, 111, 208).  It is the nature
of a producer's business that he or she has their own clients who constitute
their book of business.  (N.T. 12/16/08, 56-58).  DVFG described itself as an
independent firm/producer group with a primary company (*i.e.* first Provident
and later Principal). (N.T. 12/15/08, 77).

Bleznak are individual producers residing in Newtown Square and Maple Glen, Pennsylvania who are and have been affiliated with one or more of the DVFG entities and since 2002, were registered representatives for Defendant Princor in connection with the marketing and sale of Princor's securities products and services. Since that same time, Messrs. Bleznak, Feinman and Soloway have also been authorized agents for Defendant Principal Life Insurance Company in connection with the sale of life insurance policies underwritten and sold by Principal.  In addition to selling Principal and Princor's insurance and financial products, Plaintiffs Feinman, Soloway and Bleznak also sold insurance and financial products of other companies.  (Verified Second Amended Complaint and Answer thereto, ¶s 5, 6 and 7).

5.  In 2007, the DVFG entities moved their principal place of business from King of Prussia, Pennsylvania to Conshohocken, Pennsylvania.  (N.T. 12/16/08, 45).

6.  Defendant Principal Life Insurance Company ("Principal") is an Iowa corporation with its primary offices at 711 High Street, Des Moines, Iowa, 50392.  Principal is in the business of underwriting and issuing life insurance policies for marketing and sale by its authorized agents and brokers.  (Verified Second Amended Complaint and Answer thereto, ¶8).

7.  Defendant Princor Financial Services Corporation ("Princor") is an Iowa corporation with its principal offices at

3

711 High Street, Des Moines, Iowa, 50392.  Princor is a subsidiary of Principal Services Trust Company, which also has its principal offices at 711 High Street, Des Moines, Iowa, 50392.  (Verified Second Amended Complaint and Answer thereto, ¶9).

8.  Prior to 1983, the Philadelphia area agency affiliated with Provident Mutual Life Insurance Company was run by Leo Riley and Rudy Meyers and was known as Riley-Meyers Brokerage Services, Inc.  In 1986, they formally changed the name of the agency to Delaware Valley Financial Group, Inc. and also began doing business for other companies in addition to Provident Mutual.  (Cronin Dep. 71-72; Exhibit P-4).  In 1984, DVFG, Inc. registered as a foreign corporation to do business in New Jersey.  (N.T. 12/16/08, 41; Exhibit P-5).

9.  In 1992, Thomas Schirmer purchased Delaware Valley Financial Group, Inc. from Rudy Meyers for $25,000.  At that time, DVFG, Inc. had three offices in Philadelphia and Wayne, Pennsylvania and in Cherry Hill, New Jersey.  Although it was then affiliated with Provident Mutual, it also sold insurance and financial products for some 15 to 18 other major companies, including annuities, life and disability insurance and represented a broker-dealer in selling registered products such as mutual funds.  (N.T. 12/15/08, 17-21; Cronin Dep., 73-74).

10.  When Thomas Schirmer purchased DVFG in 1992, there were

28 employees, 20 of whom were agents.  Previously, the agency had
as many as 80 agents.  Because the agency was saddled with an
expensive, long-term lease on office space in Center City
Philadelphia where parking and the city wage tax were
problematic, Schirmer arranged to move it out of the city and out
into the suburbs as soon as possible.  Once he was able to move
from the city, Schirmer was able to recruit more agents and make
the agency successful again.  (Cronin Dep., 84-86).

    11.  In 1996, Provident Mutual approached Schirmer about
taking over their office in Wilmington, Delaware, as it was not
meeting their production requirements.  After conducting an
evaluation of that office, which was then known as the Wilmington
Financial Group, Schirmer and Delaware Valley Financial Group,
Inc. acquired it and agreed to assume the responsibility for
operating that agency.  (N.T. 12/15/08, 21-22; Exhibit P-106).

    12.  "DBA" stands for "doing business as" and in the
financial services industry, it is common for independent
agents/producers to use a DBA as a means of marketing themselves
to clients and/or prospective clients and, while some producers
elect to use an individual DBA, others prefer to use one that
shows that they are part of a group.  (N.T. 12/16/08, 111, 208-
210).  Given how complex the financial services industry has
grown with the proliferation of such products as load and no-load
mutual and exchange-traded funds, index annuities and life

insurance, it is beneficial for a producer to be affiliated with a group such as DVFG if for no other reason than the back-up and support which it provides.  (N.T. 12/15/08, 117-118).  Prior to using a chosen DBA, the agent must first obtain written approval from both the broker-dealer with whom he or she is affiliated and from FINRA, the Financial Industry Regulatory Authority, which is the largest independent regulator for all securities firms in the United States.  (N.T. 12/15/08, 32, 42; www.finra.org).

13. Prior to also using letterhead, business cards and other advertising materials, an agent and/or agency must first obtain written approval of those materials from the broker-dealer with whom they are affiliated and from FINRA.  (N.T. 12/15/08, 28).

14.  Although immediately after the merger, the producers in the Wilmington office continued to use the "Wilmington Financial Group" as their DBA, approximately six months later, they changed their DBA and began using the name, "Delaware Valley Financial Group" as their DBA as well. (N.T. 12/15/08, 23-24).  At the time he acquired the Wilmington Financial Group, Thomas Schirmer also purchased the Wilmington Financial Group DBA for some $10,000. Included with that was the logo, which included the tree that is now part of DVFG's current logo.   (Cronin Dep., 94-95).

15.  Beginning in late 2001, DVFG began looking for another life insurance and broker-dealer company to affiliate with, having encountered difficulties with Provident Mutual Life

6

Insurance Company after Provident was merged with Nationwide
Insurance Company.  In or about January, 2002, Messrs. Duncan and
Cecere, acting on behalf of Principal, began "courting" Schirmer
and DVFG with the result that in October, 2002, DVFG ceased its
affiliation with Provident and became affiliated with Principal.
(N.T. 12/15/08, 33).

16.  Principal assisted DVFG in its efforts to dis-associate
with Provident by building out new office space, acquiring files
and getting all of its letters, documents and stationary approved
before they moved.  (N.T. 12/15/08, 34).

17.  When the agents that were affiliated with DVFG left
Provident and moved to Principal, they brought all of their
clients with them.  Provident only took issue with them taking
the insurance policy customers of the agency that had been with
Provident prior to DVFG's departure.  (N.T. 12/15/08, 34).

18.  In addition to owning its DBA, DVFG also owned its own
domain, dvfg.com, and had its own website at www.dvfg.com
beginning in or around 1997.  (N.T. 12/15/08, 35-36).  Because
its producers sold products of other companies and because it had
some independent agents associated with it, DVFG needed its own
DBA.  (N.T. 12/15/08, 76).

19.  Although Principal and its legal department wanted DVFG
to use the Principal name to market all their products in their
offices, it was very important to Plaintiffs and their producers

7

that they be permitted to continue to use their DVFG DBA and
their dvfg.com domain for their website and their e-mail because
they had worked very hard at branding their company and they
believed they had gained significant name recognition in the
Delaware Valley area using that name.  This was the subject of
numerous discussions and negotiations and had Principal not
agreed to let them continue to use the DBA and the domain,
Plaintiffs would not have agreed to affiliate with Principal.
(N.T. 12/15/08, 37-38; Exhibit P-38).

20.  At the time that DVFG joined with Principal, Principal
had associations with over 30 other agencies.  DVFG was the only
agency that Principal permitted to use its own DBA and domain and
its own signage.  (N.T. 12/15/08, 38-42, 50; Exhibits P-30, P-
93).  Throughout its relationship with Principal, the prominent
signage in the DVFG offices were large initials that said "DVFG"
with small diamond periods between the letters on the fourth
floor of the highest part of the building, and a large DVFG sign
with the tree logo on the front door to the offices.  In keeping
with FINRA requirements, Princor signs also appeared in the
offices, as it was the broker-dealer. (N.T. 12/15/08, 41).

21.  DVFG negotiated additional concessions when it entered
into its affiliation with Principal.  For one, the Principal-
Princor payout grid was generally capped at 80% of gross dealer
concession but because DVFG had an 85% payout with its former

8

broker-dealer, Principal/Princor agreed to change its payout grid from 80% to 85%.  Principal also amended its agent contract in such a fashion as to immediately vest DVFG's producers in their contracts so that should they elect to leave, they would be entitled to their renewals on the business which they brought with them to Principal.  (N.T. 12/15/08, 43-44).

22.  At the time that DVFG affiliated with Principal, its producers had more than 25,000 clients.  (N.T. 12/15/08, 44).  Not all of its producers were affiliated with an insurance company and not all of its producers had contracts with Principal.  (N.T. 12/15/08, 76-77).

23.  At the time that DVFG affiliated with Principal, Principal had offices in Pittsburgh, Mechanicsburg and Radnor, Pennsylvania and Bethesda, Maryland.  In addition, it had some agents who had their own offices in the greater Philadelphia area.  (N.T. 12/16/08, 120-121; 239-240).  Throughout the period that DVFG was affiliated with Principal, Principal referred to the three DVFG offices in the greater Philadelphia region - King of Prussia/Conshohocken, PA, Wilmington, DE and Marlton, NJ, as the "Delaware Valley Business Center."  (N.T. 12/16/08, 123).

24.  Subsequent to their affiliation with Principal/Princor, Schirmer, Smith and DVFG were also given responsibility for management of Principal and Princor's agencies in Bethesda, Maryland and Pittsburgh, Pennsylvania.  (N.T. 12/15/08, 48, 141).

The producers in the Bethesda and Pittsburgh offices never wanted to and never did use any of the DVFG entity names as a DBA.  They only wanted to use the Principal name.  (N.T. 12/15/08, 142-144).

25.  In the nearly six years that DVFG was affiliated with Principal, it was one of Principal's largest revenue generating firms.  In 2007, DVFG had between 120 and 130 producers with between $5 and $6 billion in assets under management generating over $30 million in commissions.  (N.T. 12/15/08, 33, 75-76).

26.  Shortly after purchasing the Delaware Valley Financial Group in 1992, Thomas Schirmer became actively involved in a number of community groups and charitable organizations such as the Committee to Benefit Children, dedicated to raising funds to help children with cancer, the Leukemia Society of New Jersey, Meals on Wheels and Make a Wish Foundation, among others.  In support of these organizations, DVFG would buy advertising and provide financial support at benefit golf tournaments and other similar fundraising events.  In so doing, DVFG was building its name recognition and good will and supporting its individual producers.  (N.T. 12/15/08, 77-79).

27.  In addition to promoting itself and its producers through charitable support, DVFG also did much of its own advertising while it was affiliated with both Provident and Principal, primarily in the form of radio spot ads, business cards, brochures, fliers, letter mailings and client appreciation

events.  It also employed a Director of Marketing, whose primary function was to help producers develop marketing plans to penetrate the markets, at a cost of some $140,000 per year. (N.T. 12/15/08, 81-82, 90, 12/16/08, 220-221; Exhibits P-11, P-12, P-18, P-19A, P-20, P21A, P-29C and P-29D).

28.   The DVFG entities additionally marketed themselves to prospective new producers through brochures, letters and other mailings and by, *inter alia*, participating in area job fairs and Chamber of Commerce events, visiting colleges, giving seminars, and advertising in publications of the Society of Professional Advisors and the Estate Planning Council.  (N.T. 12/15/08, 84-86; Exhibits P-19B, P-43, P-44).

29.  On or about August 28, 2007[3], the plaintiffs filed an application (Serial # 77265731) with the United States Patent and Trademark Office ("USPTO") seeking to register the "Delaware Valley Financial Group, LLC" as a trademark for use in commerce in connection with financing services.  In the application, the mark was described as "...consist[ing] of standard characters, without claim to any particular font, style, size or color." (Plaintiff's Exhibit 3; N.T. 12/15/08, 161-162, 164).

---

[3]  Previously, in 2003, Thomas Schirmer had apparently endeavored to place "Delaware Valley Financial Group" on the Principal Register by the filing of an application with the USPTO under Serial No. 78/164257.  That application was rejected by the examining attorney as being primarily geographically descriptive of the applicant's services.  Apparently, neither Mr. Schirmer nor anyone acting on his behalf responded to the Office Action notice from the USPTO and the application was deemed to have been abandoned. (N.T. 12/15/08, 166-172; Exhibit D-53).

30.   The trademark registration application was initially rejected by the USPTO on December 6, 2007 "because the proposed mark is primarily geographically descriptive of the origin of applicant's goods and/or services."  It was noted, however, that "[i]f applicant amends the application to seek registration on the Principal Register under Section 2(f) or on the Supplemental Register, applicant must disclaim 'FINANCIAL GROUP, LLC,' because such wording appears to be generic in the context of applicant's goods and/or services."  (Plaintiffs' Exhibit 3. TM 1087-TM 1088; N.T. 12/15/08, 164-165).

31.   Thereafter, on June 2, 2008, Plaintiffs responded to the PTO action by disclaiming the right to exclusively use "Financial Group, LLC" apart from the mark as shown, *i.e.*, apart from the words "Delaware Valley," and by asserting that the proposed mark had become distinctive of the goods and services offered by Plaintiffs inasmuch as "Delaware Valley Financial Group" had been continuously and exclusively used in commerce since 1978.  (Exhibit P-3, TM 1084, TM 1089; N.T. 12/15/08, 166).

32.   On June 18, 2008, the USPTO issued its NOTICE OF PUBLICATION UNDER 12(a), noting that as modified, the proposed mark "appears to be entitled to registration," that it would be published in the Official Gazette on July 8, 2008, and that if no opposition was filed within the time specified by Section 13(a) of the statute, a certificate of registration would issue.

(Exhibit P-3. TM 1122).  It is unclear from the record whether there has been any opposition to the plaintiffs' registration.[4]

33.  Some of DVFG's advertising was done jointly with Principal/Princor or through "co-oping."  "Co-oping" is one method by which an agent or agency is compensated by its insurer or broker/dealer for advertising.  The agency either receives a marketing allowance out of which it may pay advertising expenses or through "co-op" advertising whereby the agency pays a portion of the advertising expense and the broker/dealer or insurance company pays the other portion.  (N.T. 12/15/08, 86-87; Exhibit P-43).

34.  At the time of the separation of the DVFG entities from Principal, there were some 100 producers working out of the five DVFG-affiliated offices (Bethesda, Pittsburgh, Conshohocken, Wilmington and Marlton, NJ) along with some 20-25 administrative staff.  The producers were paid commissions directly from the companies that they sold business to through Principal.  A certain amount of staff was paid for through the "unit cost report" account that Principal had set up pursuant to the financial package which it had negotiated at the outset with DVFG and which was tied to DVFG's productivity and volume of business

---

[4]  At page 2 of their Post Hearing Proposed Conclusions of Law on Plaintiffs' Trademark Infringement Claims, Defendants assert that Principal has contested the plaintiffs' amended application and, although Plaintiffs appear to concede that point, we can find no evidence to support that averment.

activity.   Approximately 4 staff members were employed directly by the DVFG companies themselves, including a tax attorney, and two individuals who did the financial packaging of complex proposals.  (N.T. 12/15/08, 106-109, 127-128).

35.  Since their separation from Principal, the DVFG entities continue to provide their producers with the services of the marketing director, tax attorney, compliance officer and sales support for disability and long term care insurance and business continuity planning.  (N.T. 12/15/08, 110).

36.  Thomas Schirmer retired from the Principal as a Regional Managing Director on December 31, 2007 but continued on as a registered representative for Princor.  Because he was dissatisfied with the manner in which his retirement was being handled and the manner in which Principal was treating one of his associates, he resigned from Princor in May, 2008. (N.T. 12/15/08, 121).

37.  After Mr. Schirmer retired at the end of December 2007, Marc Smith was elevated by Principal to the Regional Managing Director position.  However, following the development of what he perceived to be ethical differences and other disagreements and conflicts, Mr. Smith also resigned from the Principal on May 28, 2008.  (N.T. 12/15/08, 121-122; N.T. 12/16/08, 107, 128-129).

38.  Immediately following Mr. Smith's resignation, a large number of the producers who had been affiliated with and/or

14

identified themselves as being part of the DVFG entities also
resigned their associations with Principal.  As a result, there
was a great deal of turmoil in the Conshohocken, Marlton and
Wilmington offices, with numerous staff employees also resigning
and/or not reporting for work and a lot of personnel moving
offices as, for example, in the Conshohocken office prior to the
resignations, there had been producers located on three different
floors.  (N.T. 12/16/08, 129-131).

39.  A few days later in early June, 2008, John
Ashenbrenner, Principal's President and its Vice-President of
Marketing, Nick Cecere, among other officers from Principal's
corporate headquarters in Des Moines, IA, arrived and had several
meetings with the remaining producers and staff to assess the
situation and address their concerns.  Among the topics under
discussion was how the Principal offices and the producers who
remained would identify themselves going forward.  (N.T.
12/16/08, 50-51, 129-131).

40.  When a producer changes affiliations with a broker-
dealer, it is imperative that he or she have his existing clients
execute new agreements with the new broker-dealer authorizing the
transfer of their accounts from the old broker-dealer to the new.
Otherwise, the producer is unable to continue to service those
brokerage clients.   Typically, this process can take anywhere
from a few weeks to a few months to complete.  (N.T. 12/16/08,

118-120).

41.  Although Principal had long "hosted" the dvfg.com
domain and e-mail on its server, unbeknownst to Mr. Schirmer,
after the DVFG entities affiliated with Principal, Principal had
changed the registration on the domain name to reflect that it
was the registrant.  Mr. Schirmer learned of this change in or
around June 2008, although it apparently occurred sometime in
2007. (N.T. 12/15/08, 50-51, 55; 12/16/08, 137; Exhibits P-25, P-
27, P-31, P-61).

42.  After the DVFG entities discontinued their affiliation
with Principal, Principal did not return the domain name and it
copied over and later shut down the DVFG website, deleting all
references to DVFG and the producers who departed from Principal
with it.  These actions were taken without Thomas Schirmer's
knowledge or approval.  The website that the remaining Principal
advisors used in the months immediately following the departure
of the DVFG producers closely resembled the DVFG website before
June, 2008.  (N.T. 12/15/08, 56-57; N.T. 12/16/08, 244-248).

43.  On or about May 29, 2008, Principal shut down the e-
mail accounts of Marc Smith, Thomas Schirmer and the DVFG
producers who had elected to terminate their affiliations with
Principal on both the dvfg.com and principal.com domains.  (N.T.
12/15/08, 65-66; Exhibit P-61).  On or about that same day,
Principal also decided to "secure" the offices which it had

16

shared with the DVFG entities and producers by posting a security guard to restrict access to the offices to certain limited hours. (N.T. 12/16/08, 224).  As a result, Schirmer, Smith and the producers who decided to remain with DVFG, were unable to access their client files and were unable to send, receive or otherwise communicate with their clients via e-mail.  (N.T. 6/10/08 3-6; N.T. 12/15/08, 59-61; N.T. 12/16/08, 134-138).

44.  Despite the departure of the DVFG groups and many of their producers, the Principal group and the producers who remained with Principal/Princor continued to answer the phones using the DVFG name or just "Delaware Valley."  If the caller asked to speak with one of the producers who had left with DVFG, they were told only that producer had left the office.  No further information regarding the producer's whereabouts or how the caller could reach that producer was given.  (N.T. 12/15/08, 58-60; N.T. 12/16/08, 13-15, 54-55).

45.  For at least one month after the DVFG group left the offices which they had occupied while associated with Principal, several of the producers and staff who remained with Principal continued to identify and market themselves as the "Delaware Valley Financial Group," just as they had before May 29, 2008. No one from Principal ever told them that they should stop marketing themselves using the Delaware Valley Financial Group name. (N.T. 12/16/08, 48-49).

17

46.   Within a few weeks of the departure of the Delaware
Valley Financial Group and those producers who elected to leave
with it, the Principal and the remaining producers began
discussing new names with which to identify and market
themselves.  On or about June 11, 2008, they adopted the name
"Financial Advisors of the Delaware Valley" and they began using
it shortly thereafter and on business cards, brochures,
letterhead and other marketing materials.   (N.T. 12/15/08, 100-
101; N.T. 12/16/08, 50-53, 142-144, 186).

47.  The Principal and the group of producers who remained
with it continued to operate out of the same offices using the
same telephone numbers.  Although Principal changed the auto
attendant (answering machine) function on incoming calls in mid-
June, 2008, and endeavored to change the outgoing caller ID
function at or around the same time, the caller ID function on
outgoing phone calls from those offices continued to read "DVFG"
until late September, 2008.  (N.T. 12/15/08, 67-70; N.T.
12/16/08, 83-89, 92-97, 102-103; Exhibit D-8).

48.   In addition to the new DBA, the Principal group and
its producers developed a new website, which began operation in
November, 2008 at www.faodv.com.  (N.T. 12/16/08, 144-148, 270;
Exhibit P-72).

49.  In the first several months following the split between
the DVFG producer group from Principal/Princor, there was some

18

confusion among the clientele of both groups as to where their individual advisors were and how to contact them as well as difficulty on the part of the producers in accessing files and contacting their clients.  By the end of Summer, 2008, however, the parties had exchanged files, returned/exchanged mis-directed e-mails and attachments thereto, mail, express mail, calendar entries, and other data contained on the file server in the local office(s) and otherwise exchanged information related to whereabouts of personal property, and the dvfg domain and website contained at the dvfg.com address had been returned.  The parties had further agreed to not solicit the replacement of Principal Life Insurance and Princor Financial products and one another's clients as well by that time.  (N.T. 12/15/08, 59-61; N.T. 12/16/08, 13-15, 54-58, 164-167, 241, 259, 280-281, 294-295; Order of August 18, 2008).

50.  Despite the initial confusion and largely because the nature of the relationships between the producers and their clients is personal, there is no evidence that any of either the DVFG or the Principal producers lost any clients as a result of DVFG and its producers' decision to terminate their affiliation with Principal and/or Princor.  (N.T. 12/15/08, 186; N.T. 12/16/08, 68-69, 171-172).

51.  In addition to the Delaware Valley Financial Group entities and the Financial Advisors of the Delaware Valley, there

is at least one other group offering financial planning services
and selling insurances, annuities, securities and other financial
products and planning services using the words "Delaware Valley"
in its name located in the greater Philadelphia metropolitan or
Delaware Valley area.  That group - Delaware Valley Advisors,
LLC, which is affiliated with the Securian Financial Network,
also has several offices located throughout the area in
Southeastern Pennsylvania and Southern New Jersey.  Thomas
Schirmer has not taken any legal or other action to preclude
Delaware Valley Advisors LLC from infringing on DVFG's name or
marks.  (N.T. 12/15/08, 211-214; N.T. 12/16/08, 58-59, 286-289).

      52.  There are a number of other business entities in the
greater Philadelphia metropolitan area which use the words
"Delaware Valley," "Financial," "Advisors," "Insurance" and
"Associates" in their names.  Among these are Delaware Valley
Financial Mortgage, LLC, Delaware Valley Realty Advisors, Inc.,
Delaware Valley Investment Associates, L.P., Delaware Valley
Investors, Inc., Delaware Valley Insurance Agency, Delaware
Valley Financial Services, LLC and Delaware Valley Financial
Services, Inc.  Purportedly unaware of any of those entities, Mr.
Schirmer likewise took no legal or other action to preclude them
from infringing on DVFG's name or marks.  (N.T. 12/15/08, 215-
228; Exhibits D-19 - D-36).

      53.  Presently, Thomas Schirmer has a 50% ownership interest

in DVFG, Inc., a 50% ownership interest in DVFG Advisors, LLC, and a 30% ownership interest in DVFG, LLC.  Marc Smith now owns 50% of DVFG, Inc. (N.T. 12/15/08, 17-18, 29).  Today, Delaware Valley Financial Group, Inc., Delaware Valley Financial Group, LLC and DVFG Advisors, LLC have their principal place of business at 125 East Elm Street in Conshohocken, PA, with additional offices at 3000 Atrium Way in Marlton, NJ and 1011 Centre Road in Wilmington, Delaware.  Financial Advisors of the Delaware Valley maintain offices at 100 West Elm Street, Conshohocken, PA, 400 Lippincott Drive, Marlton, NJ, and 1013 Centre Road, Wilmington, DE with affiliate offices of the Principal Financial Group, 600 Grant Street, Pittsburgh, PA and 6550 Rock Spring Drive, Bethesda, MD.

## DISCUSSION

In their Verified Second Amended Complaint, Plaintiffs assert a common law claim for unjust enrichment and claims under the Lanham and Copyright Acts, 15 U.S.C. §1051, *et. seq.* and 17 U.S.C. §§102 and 103 for, *inter alia*, Defendants' seizure of the dvfg.com domain and infringement of the Delaware Valley Financial Group, Inc., Delaware Valley Financial Group, LLC, and DVFG Advisors, LLC marks.  The Second Amended Complaint further seeks both injunctive relief and declaratory judgment of Plaintiffs' ownership of the domain name, marks, office equipment and other property and agent files.  Plaintiffs' Motion for Temporary

Restraining Order and Preliminary Injunction likewise asserts that by locking them out of their offices, seizing their client files, e-mail accounts and domain names, the defendants caused them irreparable harm entitling them to immediate injunctive relief.

The primary purpose of a preliminary injunction is the maintenance of the status quo until a decision on the merits of a case is rendered.  Status quo is defined as the last, peaceable, noncontested status of the parties.  Kos Pharmaceuticals, Inc. v. Andrx Corporation, 369 F.3d 700, 708 (3d Cir. 2004).  To prevail on a motion for preliminary injunctive relief, the moving party must demonstrate that each of the following factors favors the requested relief:

> (1) the likelihood that the moving party will succeed on the merits;
>
> (2) the extent to which the moving party will suffer irreparable harm without injunctive relief;
>
> (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and
>
> (4) the public interest.

McNeil Nutritionals, LLC v. Heartland Sweeteners, 511 F.3d 350, 356-357 (3d Cir. 2007).  The decision whether to enter a preliminary injunction is committed to the sound discretion of the trial court and will be reversed only if the court abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof.  Shire U.S. Inc.

v. Barr Laboratories, Inc., 329 F.3d 348, 352 (3d Cir. 2003).
Preliminary injunctive relief "is an extraordinary remedy" and
"should be granted only in limited circumstances." Kos
Pharmaceuticals, supra.; Nutrasweet Company v. Vit-Mar
Enterprises, Inc., 176 F.3d 151, 153 (3d Cir. 1999).  The burden
lies with the plaintiff to establish every element in its favor
or the grant of a preliminary injunction is inappropriate.  P.C.
Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore,
LLC., 428 F.3d 504, 508 (3d Cir. 2005).  If either or both of the
fundamental requirements - likelihood of success on the merits
and probability of irreparable harm if relief is not granted are
absent, an injunction cannot issue.  McKeesport Hospital v.
Accreditation Council for Graduate Medical Education, 24 F.3d
519, 523 (3d Cir. 1994).

As noted, the plaintiffs have invoked Sections 43(a) and (d)
of the Lanham Act, as well as Sections 501, 502, 504 and 505 of
the Copyright Act as the bases for their request for, inter alia,
injunctive relief.  The Lanham Act was enacted to make
"actionable the deceptive and misleading use of marks" and to
"protect against unfair competition." Two Pesos, Inc. v. Taco
Cabana, Inc., 505 U.S. 763, 767-768, 112 S. Ct. 2753, 2757, 120
L. Ed. 2d 615 (1992), quoting §45, 15 U.S.C. §1127.  "Section
43(a) 'prohibits a broader range of practices than does §32,'

which applies to registered marks[5], but it is common ground that §43(a) protects qualifying unregistered trademarks[6] and that the general principles qualifying a mark for registration under §2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under §43(a)."   <u>Id</u>., quoting <u>Inwood Laboratories, Inc. v. Ives</u>

---

[5]   Section 32, 15 U.S.C. §1114 provides, in pertinent part,

Any person who shall, without the consent of the registrant - use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...shall be liable in a civil action by the registrant...

15 U.S.C. §1114(1)(a).

[6]   Under Section 45, 15 U.S.C. §1127, "trademark" is defined as including:

"any word, name, symbol, or device, or any combination thereof -

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term 'service mark' means any word, name, symbol, or device, or any combination thereof -

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown.  Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor."

<u>Laboratories, Inc.</u>, 456 U.S. 844, 858, 102 S. Ct. 2182, 2190-2191, 72 L. Ed. 2d 606 (1982).

Specifically, Section 43, 15 U.S.C. §1125 provides the following, in relevant part:

**(a) Civil action**

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

.......

**(d) Cyberpiracy prevention**

**(1)(A)** A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

**(i)** has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

**(ii)** registers, traffics in, or uses a domain name that –

> **(I)** in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> **(II)** in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
> **(III)** is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

.....

> **(C)** In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

.....

"The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be likely to cause confusion, or to cause mistake, or to deceive.'" Kos Pharmaceuticals, 369 F.3d at 711.  It should be noted that §43(a) of the Lanham Act provides protection for trade names as well as registered and unregistered marks; a trade name is the name used by an organization to identify its business, a trademark distinguishes its goods and a service mark distinguishes its services.  Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc., 669 F.Supp. 1297, 1317 (E.D. Pa. 1987).  Although a trade name as such is not registrable under the Lanham Act, it is nevertheless protected under the Act.  Id.

26

"Terms asserted as trademarks may fall in four categories: (1) arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; (2) suggestive terms, which suggest rather than describe the characteristics of the goods; (3) descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and (4) generic terms, which function as the common descriptive name of a product class." E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 191 (3d Cir. 2008), quoting A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir. 1986).  The Lanham Act protects only some of these categories of terms - it provides no protection for generic terms because a first-user of a term "cannot deprive competing manufacturers of the product of the right to call an article by its name.  Id., quoting Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976).  A "merely descriptive" mark describes the qualities or characteristics of a good or service and may be registered only if the registrant shows that it has acquired secondary meaning, i.e., it has become distinctive of the applicant's goods or services in commerce.  Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L. Ed. 2d 582 (1985).  Thus the general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it either (1) is inherently

27

distinctive *or* (2) has acquired distinctiveness through secondary meaning.  Two Pesos, 505 U.S. at 769, 112 S. Ct. at 2758. Finally, trademark law protects suggestive and arbitrary or fanciful terms without any showing of secondary meaning.  E.T. Browne, supra., citing Berner International Cor. v. Mars Sales Co., 987 F.2d 975, 979 (3d Cir. 1993).  As a general rule, geographical marks are primarily descriptive and no one is entitled to exclusively use a common geographic term.  American International Group, Inc. v. American International Airways, Inc., 726 F. Supp. 1479, 1477, n. 3 (E. D. Pa. 1989), citing, *inter alia*, National Conference of Bar Examiners v. Multistate Legal Studies, 692 F.2d 478, 488 (7th Cir. 1982), *cert. denied,* 464 U.S. 814, 104 S. Ct. 69, 78 L. Ed. 2d 83 (1983).

Likelihood of confusion under the Lanham Act is not limited to confusion of products, as in mis-dispensing; confusion as to source is also actionable.  Id.  Thus, "the law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 469 (3d Cir. 2005).  A cause of action for trademark infringement under both §§32(1) and 43(a) (which also encompasses unfair competition) of the Lanham Act, 15 U.S.C. §§1114(1) and 1125(a), requires that a plaintiff prove: (1) the mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark is

likely to create confusion concerning the origin of goods or
services.  Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.,
2009 U.S. App. LEXIS 6586 at *2-*3 (March 30, 2009); E.T. Browne,
supra.; A & H Sportswear, Inc.  v. Victoria's Secret Stores,
Inc., 166 F.3d 197, 202 (3d Cir. 1999).  To prevail in cases
where a mark is unregistered, a plaintiff must also show (1) that
he was the first to adopt the mark in commerce; (2) he has used
the mark continuously in commerce since its adoption; and (3) his
mark is inherently distinctive or has acquired secondary meaning.
Douglas v. Osteen, Nos. 08-3097, 08-3399, 2009 U.S. App. LEXIS
5879 at *5 (3d Cir. March 13, 2009); A & H Sportswear, 237 F.3d
at 210-211; Ford Motor Co. v. Summit Motor Products, Inc., 930
F.2d 277, 292 (3d Cir. 1991).

A "likelihood of confusion" exists when "consumers viewing
the mark would probably assume that the product or service it
represents is associated with the source of a different product
or service identified by a similar mark."  Everett Laboratories,
Inc. v. Vertical Pharmaceuticals, Inc., No. 06-1661, 2007 U.S.
App. LEXIS 13975, 227 Fed. Appx. 124, 127 (3d Cir. June 13,
2007), quoting A &H Sportswear, Inc. v. Victoria's Secret Stores,
Inc., 237 F.3d 198, 211 (3d Cir. 2000).  There are two types of
"likelihood of confusion" claims - "direct confusion" claims and
"reverse confusion" claims.  Freedom Card, 432 F.3d at 470.  The
essence of a direct confusion claim is that a junior user of a

mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark.  <u>Id</u>. Reverse confusion occurs when a larger, more powerful company uses the trademark of a small, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services.  <u>Citizens Financial Group v. Citizens National Bank</u>, 383 F. 3d 110, 119 (3d Cir. 2004).  Thus, the "junior" user is junior in time but senior in market dominance or size. <u>Freedom Card</u>, 432 F. 3d at 471.

In deciding whether similar marks create a likelihood of confusion, the Third Circuit has adopted a non-exhaustive test using 10 factors for determining the likelihood of confusion between two marks where direct confusion is alleged.  <u>Freedom Card</u>, 432 F.3d at 470, citing <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d 460 (3d Cir. 1983).  Those factors are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through

the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

The Lapp test is a qualitative inquiry; and not all factors will be relevant in all cases; further the different factors may properly be accorded different weights depending on the particular factual setting.  Basketball Marketing Co. v. FX Digital Media, Inc., Nos. 06-2216, 06-3274, 2007 U.S. App. LEXIS 28605, 257 Fed. Appx. 492, 494 (3d Cir. 2007).  A district court should utilize the factors that seem appropriate to a given situation but, in so doing, it is incumbent upon the district courts to explain the choice of Lapp factors relied upon. Basketball Marketing, 257 Fed. Appx. at 494, fn. 3 (3d Cir. Dec. 11, 2007); Freedom Card, 432 F.3d at 471.

Copyright infringement is somewhat similar.  To show copyright infringement, a plaintiff must establish (1) the ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991); Douglas v. Osteen, 2009 U.S. App. LEXIS 5879 at *3 (3d Cir. March 13, 2009).  The law

does not require an express or written license.  In appropriate circumstances, a non-exclusive license may be implied by conduct. Lowe v. Loud Records, 2005 U.S. App. LEXIS 4753, 126 Fed. Appx. 545, 547 (3d Cir. March 23, 2005).

However, since a non-exclusive or implied license does not transfer ownership, there may still be a claim of copyright infringement if the licensed use goes beyond the scope of the license.  Feist, supra.  It is fundamental, however, that no author may copyright his ideas or the facts he narrates, although factual compilations may possess the requisite originality to merit copyright protection.  See, Feist, 499 U.S. at 344-345, 348, 111 S. Ct. at 1287, 1289; Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005).  Indeed, to qualify for copyright protection, a work must be original to the author, meaning only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.  Id.; Kay Berry, 421 F.3d at 207.

It is further axiomatic that, in accordance with 17 U.S.C. §411(a), "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title..."  See, Kay Berry, 421 F. 3d at 203. Plaintiff's possession of a copyright registration certificate

creates a rebuttal presumption that the work is copyrightable and that Plaintiff has a valid interest. F.A. Davis Co. v. Wolters Kluwer Health, Inc., 413 F. Supp. 2d 507, 510 (E.D. Pa. 2005). "Copying is a shorthand reference to the act of infringing any of the copyright owner's exclusive rights set forth at 17 U.S.C. §106." Dun & Bradstreet Software Services v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir. 2002), quoting Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir. 1991).[7] Not all copying is copyright infringement and courts have recognized that there is rarely direct evidence of copying. F.A. Davis Co. v. Wolters Kluwer Health, Inc., 413 F. Supp. 2d 507, 511 (E.D. Pa. 2005). Instead, copying is proven by showing not only that the defendant had access to a copyrighted work but also

---

[7]  Section 106 reads as follows:

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

33

that there are substantial similarities between the two works.
Feist Publications, 499 U.S. at 361, 111 S. Ct. at 1282; Dam
Things From Denmark v. Russ Berrie & Co., 290 F.3d 548, 561-562
(3d Cir. 2002).  In other words, "it must be shown that copying
went so far as to constitute improper appropriation, the test
being the response of the ordinary lay person." Kay Berry, 421
F.3d at 208, quoting Universal Athletic Sales Co. v. Salkeld, 511
F.2d 904, 907 (3d Cir. 1975).  And, [e]ven if actual copying is
proven, "the fact-finder must decide without the aid of expert
testimony, but with the perspective of the 'lay observer,'
whether the copying was 'illicit' or 'an unlawful appropriation'
of the copyrighted work." Id., quoting Whelan Associates, Inc.
v. Jaslow Dental Lab, Inc., 797 F.2d 1222, 1232 (3d Cir. 1986).

Finally, the common-law tort of unfair competition was
developed to protect "against the wrongful exploitation of trade
names and common law trademarks that were not otherwise entitled
to legal protection." Centrix HR, LLC v. On-Site Staff
Management, Inc., 2008 U.S. Dist. LEXIS 23280 at *51 (E.D. Pa.
March 25, 2008), quoting Granite State Insurance Co. v. Aamco
Transmissions, 57 F.3d 316, 319 (3d Cir. 1995).  See Also,
Pennsylvania State University v. University Orthopedics, Ltd.,
706 A.2d 863, 867 (Pa. Super. 1998)("claim of unfair competition
encompasses trademark infringement but also includes a broader
range of unfair practices, which may generally be described as a

misappropriation of the skill, expenditures and labor of
another.") Unfair competition has otherwise been defined as "the
passing off by a defendant of his goods or services as those of
plaintiff by virtue of substantial similarity between the two
leading to confusion on the part of potential customers."
Prudential Insurance Co. of America v. Stella, 994 F. Supp. 318,
322 (E.D. Pa. 1998).  To succeed on these claims, a plaintiff
must show that defendant uses a designation in connection with
goods, which is likely to cause confusion, mistake or deception
as to the origin, sponsorship or approval of defendant's goods
and that plaintiff has been or is likely to be damaged by these
acts.  Id., citing First Keystone Bank v. First Keystone
Mortgage, Inc., 923 F. Supp. 693, 707 (E.D.Pa. 1996).  See Also,
Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d
838, 848 (1957)("trading on another's business reputation by use
of deceptive selling practices or other means is enjoinable on
the grounds of unfair competition").

        In applying the preceding legal principles to the case at
hand, it appears that while the plaintiffs did endeavor to
register the "Delaware Valley Financial Group, LLC" mark, we
cannot determine whether any opposition has yet been filed to
that proposed registration.[8]  As a result, we cannot conclude

---

        [8]  Indeed, neither party adduced any testimony whatsoever on this point
at any of the hearings held in this matter on June 10, December 15 or December
16, 2008.

with certainty that the mark is in fact registered or "incontestable" within the meaning of the statute, 15 U.S.C. §1115, or that the plaintiffs are entitled to exclusively use the mark in commerce.[9]  Regardless, the plaintiffs seek relief under §43(a) of the Lanham Act, which also affords protection to unregistered marks and trade names and, as noted by the Supreme Court in Two Pesos, supra, the same general principles qualifying a mark for registration are for the most part applicable in determining whether an unregistered mark is entitled to protection under §43(a).

In considering those principles, we do find that the plaintiffs have sufficiently established through, *inter alia,* the testimony provided by Thomas Schirmer and Charles Cronin, that they were the first user of the name/mark Delaware Valley Financial Group, that Mr. Schirmer owns the tree logo which accompanies the name and/or the initials "DVFG," and that it has been continuously used in commerce in conjunction with Plaintiffs' business since its adoption.  In light of the USPTO's statement following disclaimer of the right to use the words "financial group" separate and/or apart from "Delaware Valley" that the mark appears entitled to registration barring objection, we find the requirement of validity to have been satisfied in

---

[9]   If the mark in question was federally registered and had become incontestable, validity, legal protectibility and ownership are proved.  See, e.g., Opticians Association of America v. Independent Opticians of America, 920 F.2d 187, 194 (3d Cir. 1990).

this case.

However, it is also incumbent upon the plaintiffs to show that the mark/name has acquired distinctiveness through secondary meaning.  See, e.g., Two Pesos, 505 U.S. at 769, 112 S. Ct. at 2758.  A mark is descriptive with a secondary meaning when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of those products or services.  Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 283, n. 10 (3d Cir. 2001).  Secondary meaning exists when consumers seeking a trademark assume that the product it labels came from a particular source; if in fact the product did not come from that source, there has been buyer confusion.  Lapp, 721 F.2d at 462.  It is for this reason that it has been recognized that "secondary meaning and likelihood of buyer confusion, though two separate legal issues, will be difficult to distinguish in viewing the evidence."  Id., quoting 1 J.T. McCarthy, Trademarks and Unfair Competition §15:3 (1973). Secondary meaning is generally established through extensive advertising which creates in the minds of consumers an association between different products bearing the same mark; this association suggests that the products originate from a single source.  Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978).  A non-exclusive list of factors

which may be considered in ascertaining whether a mark has
achieved secondary meaning includes the extent of sales and
advertising leading to buyer association, length of use,
exclusivity of use, the fact of copying, customer surveys,
customer testimony, the use of the mark in trade journals, the
size of the company, the number of sales, the number of customers
and actual confusion.  <u>Ford Motors</u>, 930 F.2d at 292.

Instantly, while there is evidence that the Delaware Valley
Financial Group did do some advertising on radio and through
brochures, business cards, fliers, letter mailings, promotional
items and through client appreciation and charity events, at
times these advertisements were solely in its own name and at
others these advertisements were done jointly with Principal
and/or Princor.  It does not appear that DVFG itself ever did any
advertising in newspapers, on billboards or on television.

The record also demonstrates that, within a few weeks of the
separation of Marc Smith and most of the producers who elected to
continue using the "Delaware Valley Financial Group" moniker from
the Principal group, those producers who chose to continue their
affiliation with Principal had chosen the name "Financial
Advisors of the Delaware Valley," and began using it on their
business cards, stationary, brochures, signage and eventually,
their website.  According to Raymond Ianni, whose testimony on
this point is unrebutted, the intent of these producers in

selecting this name was to describe their general geographic
location while at the same time indicating that they had
individual practices.  There is no evidence of any intention to
select a name that would be confused with Delaware Valley
Financial Group and there is no evidence that the Financial
Advisors of the Delaware Valley use a tree or other, similar logo
that in any way resembles that utilized by the DVFG entities.
What's more, in the immediate, tri-state area, there is at least
one other company offering financial planning services,
insurance, securities and other types of financial products using
"Delaware Valley" in its name.  That group, Delaware Valley
Advisors, is affiliated with the Securian Financial Network and
has offices in Huntington Valley and Newtown Square, Pennsylvania
and Mount Ephraim, Cherry Hill and Woodbury, New Jersey.

Additionally, while there is no doubt that the services
being marketed by both the DVFG and the FAODV producers are
identical and their advertising/marketing/promotional efforts are
similar, DVFG and FAODV are essentially consortiums of
independent producers who maintain their own individual books of
business and who receive new business primarily through client
referrals.  None of the clients serviced by either DVFG's
producers or those producers who are now using Financial Advisors
of the Delaware Valley as their DBA are customers of DVFG or
FAODV themselves - they are the customers/clients of the

individual producers.  Hence the likelihood that either existing or potential customers will be confused by the Financial Advisors of the Delaware Valley name is very slim indeed.

Finally, as evidenced by the testimony of Thomas Swider and Robert Holland, and by various documentary exhibits[10], it appears that although there initially was some confusion on the part of clients who called the three former offices in or around the Summer of 2008 as to the whereabouts and/or affiliations of their individual advisors and some delay in updating the business profiles for several of the producers who elected to stay with the Principal group, most, if not all, of that confusion was resolved by the late Fall of 2008.  Accordingly, we cannot find that either of the elements of secondary meaning or likelihood of buyer confusion have been shown here and thus Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their Lanham Act claim.[11]

---

[10]   See, e.g., Exhibits P-85, P-86, P-87, P-88.

[11]   Given that no mention is made of it in their post-hearing submissions, it appears as though the plaintiffs have abandoned their claim under 15 U.S.C. §1125(d)(1)(A), otherwise known as the Anticybersquatting Consumer Protection Act.  "Cybersquatting" has "come to mean the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks."  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  In essence, it forces "the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'"  Vista India v. Raaga, LLC, 501 F. Supp.2d 605, 620 (D.N.J. 2007), quoting Virtual Works, Inc. v. Volkswagen of America, Inc., 238 F.3d 264, 267 (4th Cir. 2001).  See Also, Green v. Fornario, 486 F. 3d 100, 105 (3d Cir. 2007)("§1125(d)(1)(A) prohibits registering domain name that is confusingly similar to distinctive mark or dilutive of famous mark with bad faith intent to profit from it").  As interpreted by the Third Circuit, the statute requires plaintiff to prove the following elements in order to succeed in a claim under the ACPA: (a) the mark

Given that the analysis under the Lanham Act and the common law of unfair competition is the same, we reach the same result with regard to that claim, contained in Count III, as well.  See generally, Freedom Card, 432 F.3d at 470; A & H Sportswear(III), 166 F.3d at 202; Tillery v. Leonard & Sciolla, LLP, 437 F. Supp. 2d 312, 328 (E.D. Pa. 2006).[12]  Thus, inasmuch as we cannot find that the requisite showing of a likelihood of consumer confusion has been made, we are constrained to also deny plaintiffs' request for ongoing injunctive relief on the basis of unfair competition.

Finally, although it is likewise unclear from the plaintiffs' proposed factual findings and legal conclusions whether they are continuing to pursue their claim of copyright infringement, we nevertheless shall last consider the likelihood that Plaintiffs will prevail on the merits of this claim at a

is distinctive or famous so that it is entitled to protection; (b) defendant's domain names are identical or confusingly similar to plaintiffs' mark; and (c) defendant registered the domain name with the bad faith intent to profit from it.  Pennsylvania Business Bank v. Biz Bank Corp., 330 F. Supp. 2d 511, 524 (E.D. Pa. 2004), citing Shields, 254 F.3d at 482.

The gravamen of Count II of Plaintiffs' Second Amended Complaint appears to be the co-opting of the dvfg.com domain by the defendants shortly after the resignation of Marc Smith.  Since it appears from the various Principal internal e-mails that there was at best the mistaken belief that Principal in fact owned the dvfg.com domain as it had long been hosted on their server and at worst confusion over ownership, it would be difficult to find that the element of bad faith intent has been demonstrated here.  In any event, following the entry of the temporary restraining order in August, 2008, the defendants in fact returned the dvfg.com domain to the plaintiffs and there is no evidence that they have used it since.

[12]  Indeed, it has been said that the essence of an unfair competition claim under the common law, as under the federal law, is the likelihood of confusion.  Strick Corp. v. Strickland, 162 F. Supp. 2d 372, 375 (E.D. Pa. 2001).

full trial.  In so doing, we can discern from the record no evidence whatsoever that the website which defendants are alleged to have copied over was ever copyrighted by the plaintiffs. Furthermore, while there is indeed "smoking gun" evidence that Defendants "ha[d] Advisor Square, the website host, working on copying over the DVFG site," and that they intended to "keep the template, then delete all reference to DVFG and the departed advisors...," our "layman's view" of the FAODV website in comparison to those of the various DVFG entities and Delaware Valley Advisors is that it most closely approximates the website of Delaware Valley Advisors, the Securian affiliate.  In light of this observation and in the absence of any evidence that the DVFG website was an original, independently created work, we are unable to find that there also exists a likelihood that the plaintiffs would prevail at trial on the merits of their copyright claim.  (See, Exhibit P-69).

Turning to the next requisite element - that of the threat of immediate, irreparable harm, we note that while the evidence clearly showed that the plaintiffs needed a temporary restraining order and injunctive relief commencing in late May -early June, 2008 to compel the defendants to return their client files, office furniture, personal property, domain name and e-mail accounts, it is apparent from the evidence produced at the hearings on December 15 and 16, 2008 that this need was

alleviated by that time.  Accordingly, we are likewise unable to find that the plaintiffs remain in danger of suffering immediate, irreparable harm without the issuance of an injunction.  What's more, those producers who opted to retain their affiliation with Principal and Princor are just as entitled to use a DBA as are those who elected to discontinue their associations.  As we do not find it likely that consumers or clients would mistakenly confuse an FAODV advisor with a DVFG advisor, we believe that more harm could conceivably be suffered by those producers using the Financial Advisors of the Delaware Valley/FAODV DBA were we to now enjoin them from continuing to use that chosen name than would be suffered by DVFG and its producers if we did not grant the requested injunction.  For all of these reasons, we now enter the following order and:

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the parties and subject matter of this litigation pursuant to 28 U.S.C. §1331 and §1332.

2.  Plaintiffs have failed to prove that consumers, prospective and existing customers and clients and/or the public at large are likely to be confused or misled by the Financial Advisors of the Delaware Valley name and/or mark or to mistakenly believe that FAODV and the Delaware Valley Financial Group of companies (a/k/a "DVFG") are the same entity or represent the same producers.

43

3.  By failing to show that the likelihood of confusion exists, the plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their unfair competition or Lanham Act claims.

4.  Plaintiffs have failed to demonstrate copyright infringement on the part of the defendants and have thus also failed to establish that they are likely to succeed on the merits of their copyright infringement claim at trial.

5.  The defendants have, since the entry of the temporary restraining order on or about August 18, 2008 and since the December 15 and 16, 2008 hearings in this matter, returned the disputed domain name, e-mail accounts, telephone numbers, client files, office furniture and personal property to the plaintiffs.

6.  Solely as a consequence of the defendants' having complied with the terms and conditions of the temporary restraining order in this matter, the plaintiffs are no longer in danger of suffering immediate, irreparable harm to the conduct of their business.

7.  Plaintiffs have failed to prove that they are likely to suffer immediate, irreparable harm if the Defendants are not enjoined from using the DBA of "Financial Advisors of the Delaware Valley," going forward.

8.  Defendants are more likely to suffer irreparable injury if they are enjoined from using the DBA of "Financial Advisors of

44

the Delaware Valley," "FAODV" or the domain name of faodv.com.

9.   An award of preliminary injunctive relief to Plaintiffs is not warranted based on the evidence presented.

An appropriate order follows.